**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DEBBIE DIANE MILLER,                                    Case No. 1:14-cv-562
      Plaintiff,                                                    Beckwith, J.
                                                               Litkovitz, M.J.
   vs.

COMMISSIONER OF                                      **REPORT AND**
SOCIAL SECURITY,                                       **RECOMMENDATION**
      Defendant.


Plaintiff brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the final decision of the Commissioner of Social Security (Commissioner) denying

plaintiff's application for supplemental security income (SSI).   This matter is before the Court

on plaintiff's Statement of Errors (Doc. 13), the Commissioner's response in opposition (Doc.

14), and plaintiff's reply memorandum (Doc. 15).

## I.  Procedural Background

Plaintiff filed her application for SSI in December 2010 alleging disability since January

1, 2008,[1] due to anxiety, bipolar disorder, and pain in her legs, stomach, and arms.   Plaintiff's

application was denied initially and upon reconsideration.   Plaintiff, through counsel, requested

and was granted a *de novo* hearing before administrative law judge (ALJ) Gregory G. Kenyon.

Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing.   On February 6,

2013, the ALJ issued a decision denying plaintiff's SSI application.   Plaintiff's request for

review by the Appeals Council was denied, making the decision of the ALJ the final

administrative decision of the Commissioner.

---

[1] Plaintiff amended her disability onset date to February 1, 2011 at the ALJ hearing.   (Tr. 41).

## II.  Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than 12 months.   42 U.S.C. § 1382c(a)(3)(A).

The impairment must render the claimant unable to engage in the work previously performed or

in any other substantial gainful employment that exists in the national economy.   42 U.S.C. §

1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.   If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§

416.920(a)(4)(i)-(v), 416.920(b)-(g)).   The claimant has the burden of proof at the first four steps

of the sequential evaluation process.   *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th

Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] has not engaged in substantial gainful activity since the amended alleged onset date of disability, February 1, 2011 (20 CFR 416.971 *et seq.*).

2. The [plaintiff] has the following severe impairments: cervical degenerative disc disease; degenerative joint disease of the knees; depression/bipolar disorder; and a history of polysubstance abuse (20 CFR 416.920(c)).

3. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) subject to the following limitations: (1) occasional crouching, crawling, kneeling, stooping, balancing, and climbing of ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) limited to performing unskilled, simple, repetitive tasks; (5) occasional contact with coworkers and supervisors; (6) no public contact; (7) no jobs involving rapid production pace work or strict production quotas; and (8) limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work setting from one day to the next.

5. The [plaintiff] is unable to perform any past relevant work (20 CFR 416.965).[2]

_____

[2]Plaintiff's past relevant work was as a fast food worker and cashier, which were performed at the light level of exertion; a cook, which was performed at the medium level of exertion; and a census worker, which was performed at the sedentary level of exertion. (Tr. 30, 64).

6. The [plaintiff] was born [in] . . . 1961 and was 49 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).[3]

9. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 416.969, and 416.969(a)).

10. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since the amended alleged onset date of disability, February 1, 2011 (20 CFR 416.920(g)).

(Tr. 23-31).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

---

[3]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform work as an assembler (6,000 jobs locally and 675,000 jobs nationally), an inspector (800 jobs locally and 270,000 jobs nationally), and a hand packager (1,600 jobs locally and 200,000 jobs nationally). (Tr. 31, 65-66).

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

Plaintiff raises three assignments of error on appeal. First, plaintiff asserts the ALJ's residual functional capacity (RFC) determination is not supported by substantial evidence. Plaintiff maintains that the ALJ erred in formulating the RFC by (1) failing to "adequately apply psychiatric review technique" in evaluating plaintiff's mental impairments, and (2) assigning "little weight" to her treating physician's opinions. (Doc. 13 at 7-14; Doc. 15 at 1-2). Second, plaintiff maintains the ALJ erred in discounting her credibility. (*Id*. at 14-16; *Id*. at 3). Third, plaintiff contends the ALJ's Step Five determination lacks substantial support in the record. (Doc. 13 at 16).

5

1. <u>Whether the ALJ erred in formulating plaintiff's RFC</u>.

a. *The ALJ appropriately considered the mental health evidence of record in formulating plaintiff's RFC.*

The pertinent medical evidence is summarized as follows.   May 2008 treatment notes from Dr. Roberts, plaintiff's treating physician, indicate that plaintiff suffers from depression and a history of bipolar disorder for which she was treated with Lithium.   (Tr. 475-76).   In November 2008, plaintiff appeared depressed and anxious and in May 2009, plaintiff reported anxiety and panic attacks, for which Dr. Roberts prescribed Seroquel.   Tr. 472-73.   Plaintiff reported on November 3, 2009, that the Seroquel helped her panic attacks; however, the notes indicate that Seroquel was stopped two weeks prior and plaintiff reported hearing voices occasionally or several times a week.   (Tr. 470).

Plaintiff began treating at Health Resource Center of Cincinnati, Inc. on December 11, 2009, on referral from Dr. Roberts' office.   (Tr. 319-30).   A Mental Status Exam was performed by a counselor who observed that plaintiff appeared well-groomed with average demeanor, eye contact, activity, and speech, though she appeared a little shaky or nervous.   (Tr. 320).   Plaintiff reported experiencing auditory hallucinations and hearing loud voices.   (Tr. 320, 363).   Plaintiff was noted as cooperative with logical thought processes, full affect, and normal insight and judgment, though she had a depressed and anxious mood and was sometimes tearful.   (*Id.*).   Plaintiff reported experiencing a "nervous breakdown" in 1997 but stated she did not receive treatment at that time because no one was available to care for her children.   (Tr. 321).   The counselor diagnosed plaintiff with major depressive disorder, recurrent, assigned her a Global

Assessment of Functioning score of 55,[4] and opined that plaintiff's cognitive functioning was within normal limits.  (Tr. 325, 330).

Treatment notes from Health Resource Center show that plaintiff was treated with antidepressant medication and supportive psychotherapy.  (Tr. 331-63, 414-21, 448-452, 525-46).  In December 2011, plaintiff reported feelings of irritability, especially towards her grandchildren, and stated that she hears voices saying "Let's get her" and feels bugs crawling on her back and chest areas.  (Tr. 362).  Plaintiff reported diminished concentration and memory and no longer being able to read books.  (Id.).  Plaintiff's mood was anxious and dysthymic with congruent affect; her thought process was linear; she was cooperative and engaged; and her insight and judgment were "alright."  (Id.).  January 6, 2010 treatment notes include similar reports and observations.  (Tr. 361).  On January 22, 2010, plaintiff reported pain in her knees and side, being "tired a lot" and that it was hard to be motivated.  (Tr. 360).  Plaintiff's mood was observed as "tired and sore" with a congruent affect; she had "ok" insight and judgment and a coherent and linear thought process; and she was cooperative and engaged.  (Id.).

Plaintiff was seen by a doctor at Health Resource Center on January 25, 2010, for pharmacotherapy.  (Tr. 359).  The doctor observed plaintiff was depressed with a congruent mood and she was diagnosed with depression, rule out major depressive disorder, and anxiety, rule out panic disorder.  (Id.).  The doctor prescribed Celexa.  (Id.).

---

[4]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000).  The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning."  Id.  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  Id. at 34.  Individuals with scores of 51-60 are classified as having "moderate" symptoms.  Id. at 32.  Individuals with GAF scores of 41-50 are classified as having serious symptoms or serious impairment in social, occupational, or school functioning.  Id.

March 1, 2010 treatment notes include plaintiff's reports of pain and observations that she was cooperative and engaged; had a coherent and clear thought process; had a tired but euthymic mood; and had a full range affect with good insight and judgment. (Tr. 356). March 20, 2010 treatment notes are substantially the same except plaintiff's mood was dysthymic; she was tearful; her anxiety was increased; and she reported hearing whispers and sirens occasionally. (Tr. 357). Subsequent treatment notes show that plaintiff experienced both hopeful and dysthymic moods, but she consistently presented as cooperative and engaged with a full range and congruent affect and good insight and judgment. (Tr. 355-56).

On April 19, 2010, plaintiff treated with the Health Resource Center doctor for medication management. (Tr. 354). Plaintiff reported ongoing depression, poor sleep and concentration, and experiencing less pleasure. The doctor observed that plaintiff had a depressed mood with congruent affect and diagnosed insomnia and depression NOS. (*Id.*). Plaintiff was prescribed Trazodone for insomnia. (*Id.*).

May 2010 treatment notes reflect that plaintiff was working as a census enumerator and was glad that she took the position. (Tr. 352). Plaintiff reported that her mood was better due to the Celexa and because she was getting six to seven hours of sleep nightly on Trazodone. (Tr. 352). Plaintiff reported she was only hearing voices two to three times a week, which was a significant decrease. (*Id.*). Plaintiff was cooperative, engaged, and talkative with coherent speech and logical thought processes; her mood was "ok" and hopeful with a congruent affect; and she had "alright" insight and judgment. (*Id.*). *See also* Tr. 351 (reflecting similar observations aside from a "so-so" mood and experiencing some stress). Plaintiff's Celexa and

Trazadone were continued pursuant to a June 2010 pharmacotherapy follow-up visit with the Health Resource Center doctor. (Tr. 349).

In July 2010, plaintiff was observed as cooperative, talkative and engaged; her thought process was coherent and linear; her mood was "a little distressed" with a congruent affect; she was occasionally tearful; and her insight and judgment were "ok." (Tr. 348). August 2010 treatment notes reflect similar observations but her mood was dysthymic; she was experiencing passive thoughts of hurting specific people; and she was hearing some whispering voices. (Tr. 347). At her September 2010 pharmacotherapy follow-up, plaintiff was observed as tearful and depressed; her medications were continued. (Tr. 346).

October 2010 treatment notes reflect that plaintiff was cooperative, talkative and engaged; her thought process was coherent and linear; her mood was pensive with a full range and congruent affect; and her insight and judgment were "ok." (Tr. 344). Plaintiff's mood was a "little down" and anxious with a congruent affect in November 2010, but she otherwise presented the same as the prior month. (Tr. 342-43). At her November 2010 pharmacotherapy follow-up, plaintiff reported that she had Dr. Roberts rework her prescription from Seroquel to Prozac. (Tr. 341). The doctor observed that plaintiff had a depressed mood and congruent affect, with passive suicidal ideation. (Id.).

In January 2011, plaintiff reported poor sleep and increased depression. (Tr. 339). She was observed as cooperative, talkative and engaged; her mood was "a little anxious" with congruent affect; and her insight and judgment were "alright." (Id.). February 2011 pharmacotherapy notes include plaintiff's reports that Prozac helped but she ran out. (Tr. 338). The doctor observed that her mood was "ok" and she had an appropriate affect with no suicidal

ideation; she was restarted on Prozac and Trazadone.   (*Id*.).   Plaintiff reported to her counselor

that she felt "shaky" being off her meds.   (Tr. 336).   At the next visit, plaintiff reported

difficulty sleeping and she was advised to discuss increasing her Trazadone dosage with the

doctor.   (Tr. 335).   During March 2011 she presented as cooperative and engaged with a

contemplative mood, full range affect, and normal insight and judgment.   (Tr. 333, 335).   At a

March 2011 pharmacotherapy appointment, the doctor noted that plaintiff reported that her

depression was "stable."   (Tr. 334).

On April 10, 2011, W. Michael Nelson, Ph.D., examined plaintiff for disability purposes.

Dr. Nelson noted that plaintiff was cooperative but related in a depressed fashion.   Plaintiff

exhibited no autonomic signs of anxiety, ideas of reference, delusions, paranoid ideation,

hallucinations, or other markedly unusual thought content.   However, she reported experiencing

auditory anomalies on a nightly basis.   Plaintiff was oriented in all spheres; had adequate remote

memory; and was able to repeat five digits forward and four backwards, and correctly sequence

five digits.   Dr. Nelson estimated her current functioning was in the low average range of

intelligence.   Dr. Nelson diagnosed a mood disorder and assigned plaintiff a GAF score of 52.

Dr. Nelson opined that plaintiff could understand, remember, and follow instructions

commensurate with her low average intellectual range and that she had adequate attention,

concentration, persistence, and pace.   Dr. Nelson noted plaintiff would have some deficits in

social functioning and stress tolerance and difficulties in responding appropriately to work place

pressures.   (Tr. 364-70).

State agency psychologist, Caroline Lewin, Ph.D., reviewed the record on August 12,

2011, and determined that plaintiff had moderate restriction in her activities of daily living;

moderate restriction in maintaining social functioning; moderate restriction in maintaining

concentration, persistence or pace; and no episodes of decompensation of extended duration.

Dr. Lewin found that plaintiff's allegations were only partially credible because the objective

medical evidence did not support her reported physical limitations.   She concluded that plaintiff

had sufficient concentration and social functioning to be able to complete simple tasks; would

not require special supervision while working; was able to handle simple instructions in a

routine, low stress work setting without a high degree of challenges and without strict production

quotas, pace, or standards; and was limited to relating in a minimized or superficial manner.

(Tr. 82-86).

     In December 2011, plaintiff was admitted to the hospital due to increasing depression and

auditory hallucinations.   (Tr. 423-46).   Plaintiff reported increasing stress due to financial

concerns and her adult children.   (Tr. 423).   Plaintiff stated that she had been without her

Prozac and Trazodone for three months.   (*Id.*).   She had been vocalizing thoughts about hurting

her family and herself, and she complained of auditory hallucinations telling her to "stab them."

(*Id.*).   She was started on Prozac and Trazodone, and Perphenazine was added for the voices.

(*Id.*).   With the combination medications plus inpatient treatment, the physicians noted

continued improvement and resolution of the suicidal and homicidal ideations.   During

treatment, plaintiff admitted to smoking marijuana periodically; her urine drug screen was

positive for marijuana; and she was advised not to smoke marijuana as it can contribute to

psychotic symptoms.   (Tr. 423-46).

     Plaintiff was assessed by a social worker in February 2012 at Centerpoint Health.   (Tr.

536-42).   The social worker observed that plaintiff's appearance was appropriate; her behavior

11

and attitude were cooperative; she had fair impulse control and normal psychomotor activity; her posture was slumped and her facial expression was sad; her stream of thought was clear and coherent; she reported auditory hallucinations; her mood and affect were depressed; her memory was fair; and her insight was limited and her judgment impaired. (Tr. 536, 540). Plaintiff was assigned a GAF score of 42 and diagnosed with bipolar disorder and severe depression with psychotic features. (Tr. 542).

On April 23, 2012, plaintiff began treating with psychiatrist, A. Weech, M.D., at the Talbert House. (Tr. 535). Dr. Weech adjusted the dosage of plaintiff's antidepressant medication and continued her Trazadone and Perphenazine medications. (*Id.*). Plaintiff reported in June 2012 that she was feeling some depression and hearing voices but only when she was alone. (Tr. 532). She also reported that the increased dosage of medication helped. (*Id.*). Dr. Weech noted that plaintiff's sleep was "ok" on the Trazadone. (*Id.*). In August 2012, plaintiff reported feeling "ok" at times and depressed at other times; having panic attacks several times a day; experiencing anger spells several times a week; and hearing mumbling voices at night. (Tr. 528). Dr. Weech increased the Trazadone dosage and added Lithium because plaintiff stated Lithium helped in the past. (*Id.*). In September 2012, plaintiff reported less depression and feeling a "little better." (Tr. 526). She still heard voices but stated that she had not taken the prescribed Lithium. (*Id.*).

Based on the above evidence, the ALJ found that plaintiff had mild restriction in her activities of daily living; moderate difficulties in social functioning; and moderate difficulties with regard to concentration, persistence or pace. (Tr. 24). The ALJ also found she had experienced one to two episodes of decompensation. (*Id.*). The ALJ further determined that

12

plaintiff retained the RFC to perform a limited range of light work with the following mental impairment based restrictions: performing only unskilled, simple, repetitive tasks; having only occasional contact with coworkers and supervisors and no contact with the public at large; performing no jobs involving rapid production pace work or strict production quotas; and performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work setting from one day to the next.   (Tr. 25).

Plaintiff asserts that this RFC formulation lacks substantial evidentiary support because the ALJ failed to adequately explain his rationale for assessing these limitations.   (Doc. 13 at 11).   Plaintiff maintains that the ALJ mischaracterized the record evidence in determining that plaintiff's decompensation episode was "a short-term exacerbation of her bipolar disorder."   (*Id.* at 11-12, citing Tr. 28).   Plaintiff further contends that the RFC does not otherwise accommodate her established limitations in activities of daily living, ability to maintain concentration, persistence or pace, and social functioning. (*Id.*).

Contrary to plaintiff's argument, the ALJ adequately explained his rationale for finding that plaintiff retained the mental RFC to perform a limited range of work.   The ALJ summarized plaintiff's mental health medical records and testimony and explained his RFC formulation by noting that the treatment records establish that medication has been effective in improving plaintiff's symptoms and regulating her mood.   *See* Tr. 26, 28 (citing Tr. 413-17, 447-52, 523-46).   The ALJ further explained that the treatment records established that plaintiff's symptoms were of no more than moderate level severity and that the consultative examination report from Dr. Nelson supported this conclusion.   (Tr. 28, citing Tr. 364-70).   The evidence cited by the ALJ and detailed *supra* substantially supports these findings.   *See generally* Tr.

13

331-63, 525-46 (plaintiff consistently reported only mild levels of depression and anxiety; she frequently presented with normal insight and judgment and thought processes; and only occasionally was plaintiff observed to be more than moderately depressed or tearful).

The ALJ also reasonably determined that although plaintiff experienced an episode of decompensation in December 2011, this was a temporary exacerbation of her symptoms that coincided with a period of medication noncompliance.   (Tr. 28, citing Tr. 422-46).   Plaintiff's inpatient hospitalization followed a three month period where plaintiff had not taken Prozac and Trazadone.   The attending doctor found that with medication and treatment her status consistently improved to the point of total resolution of her suicidal and homicidal ideation.   (Tr. 423).   In addition, plaintiff reported improvement in her depression with medication after the hospitalization.   (Tr. 526, 532).   The ALJ did not mischaracterize the evidence as alleged by plaintiff and it was reasonable for the ALJ to determine that plaintiff's decompensation episode was anomalous and related to her noncompliance with medication.

Further, the RFC formulated by the ALJ accommodates all of plaintiff's medically established limitations.   The consultative examining psychologist and state agency reviewing psychologist both opined that plaintiff was capable of completing simple tasks in a low stress work environment with no strict production quotas and little to no change provided that she have limited social interactions.   *See* Tr. 84-86, 369-70.   Plaintiff does not cite to any medical evidence in the record showing that her mental health impairments cause additional functional limitations not accounted for by the ALJ's RFC formulation.   To the extent plaintiff claims the ALJ failed to consider her ongoing auditory hallucinations (Doc. 13 at 12, citing Tr. 319-30, 342, 347, 355, 536-42), this assertion is inaccurate as the ALJ clearly referenced the treatment notes

14

documenting hallucinations throughout his decision and he directly questioned plaintiff about her

hallucinations at the ALJ hearing.   *See* Tr. 26 (citing Tr. 49-50, 54), Tr. 28 (citing Tr. 318-63,

523-46).   In addition, the consultative examining and state agency reviewing psychologists

considered the treatment notes documenting plaintiff's reported hallucinations and opined that

despite this symptom, she retained the capacity to perform simple, low stress work.

　　　Insofar as plaintiff maintains the ALJ committed reversible error by failing to adequately

explain his findings that plaintiff has mild restriction in activities of daily living and moderate

difficulties in social functioning and maintaining concentration, persistence or pace (Doc. 13 at

11), the undersigned disagrees.   Plaintiff's argument is concerned with the ALJ's Step Three

listings determination that her mental health impairments do not meet or medically equal a listed

impairment.   *See* Doc. 13 at 13 (plaintiff claims that "[t]he ALJ's failure to adequately explain

[these] findings is especially harmful because, had the ALJ analyzed [p]laintiff in accordance to

the psychiatric review technique, it is possible that he would have found [her] condition to meet

or equal Listing 12.04.")   To the extent this sentence is plaintiff's attempt to challenge the ALJ's

Step Three finding, this speculation is unpersuasive.   Plaintiff does not explain how the evidence

establishes that her mental health impairment meets the criteria of Listing 12.04; indeed, the

criteria are not even set forth in her Statement of Errors.   "It is well-established that issued

adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation,

are deemed waived."   *Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006)

(internal quotations omitted).   Similarly, "[i]t is not sufficient for a party to mention a possible

argument in the most skeletal way, leaving the court to . . . put flesh on its bones."   *McPherson*

*v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997); *see also Przytulski v. Astrue*, No. 1:11-cv-1518,

15

2012 WL 2025299, at *6 (N.D. Ohio June 5, 2012) ("The Court will not cull through the record and speculate on which portion of the record a party relies; indeed, the Court is not obligated to wade through and search the entire record for some specific facts that might support a party's claims."). Because plaintiff offers no explanation or citation to evidence demonstrating how the record establishes that she meets the criteria of Listing 12.04, the Court finds that she has waived this argument.

Plaintiff further argues that the ALJ erred by failing to apply the psychiatric review technique set forth in 20 C.F.R. § 404.1520a in analyzing her mental impairments. (Doc. 13 at 10-13). Plaintiff appears to contend that the ALJ was required to provide his own detailed psychiatric review technique form (PRTF), rather than rely on PRTFs completed by medical sources in the record. However, as noted by the Sixth Circuit, all that is required of the ALJ is that his written decision incorporate the pertinent findings and conclusions based on the technique. *See Rabbers*, 582 F.3d at 653-54 (citing 20 C.F.R. § 404.1520a(e) and Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50, 746 (Aug. 21, 2000)) (noting that prior to 2000, "an ALJ was required to complete a PRTF and append the form to the decision," but that the regulation was subsequently amended). Because the ALJ included specific findings as to the degree of plaintiff's limitation in the areas of activities of daily living, maintaining concentration, persistence or pace, and social functioning, and noted her history of decompensation episodes in his decision, *see* Tr. 24, he did not err under 20 C.F.R. § 404.1520a(e). *Cf. Rabbers*, 582 F.3d at 655 (holding that the ALJ erred under 20 C.F.R. § 404.1520a(e) because his decision did not include these specific findings).

16

In this case, the ALJ provided a detailed assessment of plaintiff's mental health records and the relevant medical opinion evidence in formulating the RFC which, as stated above, is substantially supported by this evidence.   The ALJ's decision includes a narrative discussion explaining how the mental health evidence of record supports his conclusions and this is all that is required. *See* Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *7 (July 2, 1996).[5]   The ALJ here built "an accurate and logical bridge between the evidence and the result," *see Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996), such that the Court is able to determine that his conclusions are substantially supported by the evidence cited.   The Court therefore finds that the ALJ did not err in formulating the RFC as it accommodates all of plaintiff's established mental health-based limitations.

b. *The ALJ did not err in weighing Dr. Roberts' opinion evidence*.

Plaintiff began treating with Dr. Roberts on October 31, 2005 and saw him about four times a year for checkups under the diagnoses of depression and low back pain.   (Tr. 314-15). Plaintiff's symptoms included pain in her legs, headaches, and blurry vision.   (Tr. 315).

Due to plaintiff's complaints of neck pain and radicular symptoms to the right hand, Dr. Roberts ordered a cervical spine MRI.   The MRI was performed on March 28, 2006, and showed a central disc protrusion at C6-C7 abutting the anterior spinal cord and mild to moderate foraminal stenosis was suspected at C4-C5.   (Tr. 263).   On May 12, 2008, plaintiff complained of arm and leg aches and was diagnosed with myalgia.   (Tr. 476).   On June 5, 2009, Dr. Roberts found positive tenderness in the bilateral hips.   (Tr. 472).   On February 25, 2010, plaintiff

---

[5]"Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations' adopted by the Commissioner.   20 C.F.R. § 402.35(b)(1).   In *Wilson,* 378 F.3d at 549, the court refrained from ruling on whether Social Security Rulings are binding on the Commissioner in the same way as Social

reported that her depression was better on Celexa. (Tr. 387). Plaintiff reported leg, back, and side pain in 2010 and 2011. (Tr. 379-87).

On March 2, 2011, Dr. Roberts opined that plaintiff could sit for six hours and stand/walk for two hours in an eight hour work day; she would need unscheduled breaks once an hour for about five minutes; she could frequently carry less than 10 pounds and occasionally carry 10 pounds; and she would be absent from work about once or twice a month. (Tr. 315-16).

Consultative examining physician Phillip Swedberg, M.D., examined plaintiff on April 18, 2011. Plaintiff reported to Dr. Swedberg that her main problem was her legs. She had been unable to work since 2005 after she fell down a flight of stairs at work and landed on her knees, but she had seen no physician at that time. Plaintiff denied grinding or popping in her joints; swelling, redness, or warmth; weakness over the legs; or a history of instability, stumbling, or falls. Plaintiff also reported that she was taking no medications for pain, other than over the counter Ibuprofen or Tylenol. Dr. Swedberg found plaintiff had trouble forward bending, but otherwise she had a normal physical examination. Dr. Swedberg found no evidence of muscle atrophy or muscle spasm; no tenderness of the lumbar spinous processes; negative straight leg raise bilaterally; no leg length discrepancy; no tenderness on palpation of the hips; no evidence of muscle weakness; all sensory modalities were well-preserved; brisk deep tendon reflexes; and no evidence of crepitus, ligamentous laxity, tenderness to palpation, side to side variation in laxity, joint line opening, or rotary instability in the knees. Dr. Swedberg assessed bilateral leg pain of uncertain etiology and obesity. He opined that based on the findings of this examination, plaintiff appeared capable of performing a moderate amount of sitting, ambulating, standing,

---

Security Regulations, but *assumed* that they are. [The Court] makes the same assumption in this case." *Ferguson v. Comm'r of Soc. Sec.,* 628 F.3d 269, 272 n.1 (6th Cir. 2010) (emphasis in original).

bending, kneeling, pushing, pulling, lifting and carrying heavy objects.   In addition, he opined that plaintiff had no difficulty reaching, grasping, and handling objects.   Dr. Swedberg found no visual and/or communication limitations and did not ascribe any environmental limitations.   (Tr. 371-77).

After reviewing the record in August 2011, William Bolz, M.D., a state agency physician, opined that there was no evidence of a severe impairment, noting the consultative examination was basically normal except for forward bending.   (Tr. 81).   Dr. Bolz also found that Dr. Roberts' March 2011 assessment was not supported by the overall evidence.   (Tr. 83).   On November 15, 2011, state agency physician Elaine Lewis, M.D., reviewed the record on reconsideration and determined that there was insufficient evidence to evaluate plaintiff's physical condition.   (Tr. 98-99).

On examination on October 7, 2011, Dr. Roberts found tenderness in plaintiff's right SI joint, tenderness in the bilateral knees, and pain during the valgus and varus maneuver.   (Tr. 469).   On January 9, 2012, Dr. Roberts noted decreased range of motion and severe pain with lateral flexion.   (Tr. 465).

An MRI of plaintiff's knees taken on March 16, 2012, revealed severe chondromalacia involving the weight-bearing aspect of the medial femoral condyle with focal full-thickness and moderate chondromalacia involving the anterior and lateral compartment of the knee joint.   (Tr. 457-58).

On May 16, 2012, plaintiff was seen in consultation at the Orthopedic Surgery Outpatient Clinic due to right knee pain.   On examination, plaintiff ambulated with mild arthalgia favoring

19

the right knee and she was assessed with right knee osteoarthritis.   She was given an injection into her knee, prescribed Celebrex, and was advised to attend aquatic therapy.   (Tr. 492-93).

When seen by Dr. Roberts on July 6, 2012, the doctor found palpation tenderness in plaintiff's right and left knees, along with mild pain with motion in the left knee.   (Tr. 490).

Plaintiff was seen for follow-up at the Orthopedic Clinic on September 10, 2012.   An x-ray of plaintiff's right knee showed mild degenerative changes.   (Tr. 507).   Plaintiff was assessed with bilateral knee osteoarthritis and given another injection into both knees.   (Tr. 508-09).

On March 7, 2013, Dr. Roberts opined that plaintiff could sit for six hours, 45 minutes at a time, and stand/walk for two hours, 30 minutes at a time, in an eight-hour work day.   Dr. Roberts further opined that plaintiff could occasionally lift less than 10 pounds, but never more. He further determined that plaintiff requires unscheduled fifteen minute breaks every two hours and that she would be absent from work more than four times a month.   (Tr. 454-55).

The ALJ afforded "little weight" to Dr. Roberts opinions finding that plaintiff received only conservative treatment from Dr. Roberts which did "not warrant the sedentary level limitations that [he] suggests."   (Tr. 29).   The ALJ further noted that the limitations are not supported by the findings at the consultative examination.   (*Id.*).

Plaintiff argues that the ALJ's RFC formulation is deficient because it does not include limitations put forth by her treating physician, Dr. Roberts.   (Doc. 13 at 13-16).   Plaintiff argues that the ALJ erred in giving "little weight" to Dr. Roberts' conclusions because they are "well-supported by his own treatment notes and the objective medical evidence."   (*Id.* at 14).

20

Plaintiff further maintains the ALJ violated the Social Security regulations in weighing Dr. Roberts' opinions by failing to consider the length of the treatment relationship.  (*Id.* at 15-16).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight.   "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997).  *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.").  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)).  *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).   If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.   These factors include the length, nature and extent of the treatment relationship and the frequency of examination.  20 C.F.R. §

416.927(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544.   In addition, the ALJ must consider the medical

specialty of the source, how well-supported by evidence the opinion is, how consistent the

opinion is with the record as a whole, and other factors which tend to support or contradict the

opinion.   20 C.F.R. § 416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always

give good reasons in [the] notice of determination or decision for the weight [given a] treating

source's opinion.'"   *Cole*, 661 F.3d at 937 (citation omitted).   *See also Wilson*, 378 F.3d at 544

(ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion).

Those reasons must be "supported by the evidence in the case record, and must be sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight."   *Cole*, 661 F.3d at 937 (citing SSR

96-2p, 1996 WL 374188 (1996)).   This procedural requirement "ensures that the ALJ applies the

treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Gayheart*, 710 F.3d at 544 (quoting *Wilson*, 378 F.3d at 544).

Here, the ALJ gave "good reasons" for discounting Dr. Roberts' opinions.   As noted by

the ALJ, Dr. Roberts' treatment notes do not support his opinion that plaintiff's impairments

limit her to sedentary work.   Though plaintiff points to a 2006 MRI of her cervical spine

showing moderate to marked C5-C6 stenosis and mild C4-C5 stenosis (Doc. 13 at 13), the ALJ

reasonably noted that plaintiff received little treatment for a neck impairment and physical

examination was inconsistent with cervical pathology.   (Tr. 27, citing Tr. 260, 371-77, 379-406).

Nor did Dr. Roberts identify plaintiff's neck impairment as a basis for any work-related

limitations.   (Tr. 315-16, 454-55).   Plaintiff also points to Dr. Roberts' findings of tenderness

22

on plaintiff's hips, knees, and right SI joint; pain during the valgus and varus maneuver; and decreased range of motion and severe pain with lateral flexion on examinations in 2009, 2011, and January 2012. (Tr. 381-82, 465, 469). However, these symptoms were not consistently noted throughout Dr. Roberts' treatment records and many of these same treatment notes showed normal or mild clinical findings. For example, June 2009 treatment notes show that plaintiff had good range of motion and full strength throughout (Tr. 472); November 2011 notes show plaintiff had 5/5 strength in both lower extremities, normal sensation, and negative straight leg raising (Tr. 465); examination in early July 2012 revealed only mild pain on range of motion testing (Tr. 480); and on physical examination in late July 2012, plaintiff was negative for myalgias, she had normal range of motion and no edema or tenderness, and she exhibited normal strength. (Tr. 485-86). It was reasonable for the ALJ to determine, based on the range of findings in Dr. Roberts' treatment notes and plaintiff's conservative treatment, that the treating physician's more restrictive opinions were not consistent with his examination findings.

Further, the ALJ's finding that Dr. Roberts' opinions were inconsistent with the other evidence of record is supported by substantial evidence. Dr. Swedberg's examination revealed that plaintiff's cervical range of motion was within normal limits; her muscle strength was well preserved throughout; she had diminished spinal extension and lateral flexion, but there was no evidence of paraspinals muscle spasm and no tenderness with percussion; straight leg raising was normal; range of flexion, external rotation, and abduction of the hips was normal and there was no pain on palpation; flexion of the knees was normal; and there was no rotary instability or evidence of crepitus, ligamentous laxity or tenderness to palpation over the knee joints. (Tr. 372-73). Plaintiff reported she was taking no medications for pain other than over-the-counter

Ibuprofen or Tylenol. (Tr. 371). Further, a September 2012 physical exam at the Orthopaedic Surgery Outpatient Center revealed that despite a March 2012 MRI of plaintiff's right knee showing moderate to severe chondromalacia (Tr. 475), plaintiff had a normal gait and full active and passive range of motion in both knees, with "just generalized pain along the medial compartment of both knees, nothing laterally." (Tr. 510-11). In addition, the record demonstrates that plaintiff "gets decent relief" from knee pain with cortisone injections. *See* Tr. 508-11. The ALJ appropriately considered the record as a whole in assessing Dr. Roberts' opinions and his decision to afford them "little weight" is substantially supported by the record.

Plaintiff argues that the ALJ's decision must be remanded because he "failed to consider Dr. Roberts'[ ] lengthy treatment relationship" as required by 20 C.F.R. § 416.927. (Doc. 13 at 13). Plaintiff's assertion is inaccurate. Review of the ALJ's decision establishes that he took into account this regulatory factor in weighing Dr. Roberts' opinions. *See* Tr. 26 ("[Plaintiff] testified that she sees her primary care physician, Dr. Roberts, every couple of months and she has seen him for the past six years."). Because the ALJ explicitly acknowledged the length and frequency of plaintiff's treatment relationship with Dr. Roberts, the Court finds no error in this regard.

For the above reasons, the undersigned finds that the ALJ's decision to discount Dr. Roberts' opinions is substantially supported because his treatment records and the objective evidence of record do not support the limitations he ascribed and his opinions are inconsistent with the other medical evidence of record. Accordingly, plaintiff's first assignment of error should be overruled.

24

2. Whether the ALJ erred in assessing plaintiff's credibility.

For her second assignment of error, plaintiff contends the ALJ erred by discounting her credibility.   The ALJ determined that "the record does not support [plaintiff's] allegation that her impairments are so severe that they prevent her from working."   (Tr. 27).   The ALJ further stated that the record evidence "fails to document that [plaintiff] has demonstrated most of the signs, findings, or treatment associated with debilitating disorders."   (*Id*.).   The ALJ stated that despite having a history of neck pain and objective findings of spinal stenosis, plaintiff had gotten "little treatment for her cervical complaints" and the physical examination records do not establish cervical pathology.   (*Id*., citing Tr. 260, 371-77, 378-406).   Additionally, the ALJ noted that plaintiff's reports of disabling knee pain were inconsistent with evidence showing that cortisone injections have effectively alleviated her pain.   (Tr. 27).   The ALJ also cited to the consultative examiner's examination findings and the September 2012 Orthopaedic Surgery Outpatient Center examination results to support his determination that the evidence did not support plaintiff's claim of disabling impairments.   (Tr. 27-28, citing Tr. 371-77, 479-509). Lastly, the ALJ determined that plaintiff's misrepresentations to the consultative examining psychologist regarding her history of substance abuse undermined her credibility and, further, that plaintiff's ability to regularly smoke marijuana and cigarettes belied her claims that she was unable to afford additional treatment.   (Tr. 28, citing Tr. 49, 58-59, 365).

Plaintiff argues the ALJ's credibility determination should be reversed because: (1) "there is no evidence in the record to support the ALJ's finding that [p]laintiff's knee shots alleviate her pain" as there is no medical evidence in the record after she received injections in September 2012; (2) the ALJ failed to take into account plaintiff's financial situation in considering her

failure to undergo physical therapy or other treatments for pain; and (3) the ALJ failed to consider plaintiff's inability to do chores or attend to personal hygiene and the measures she employs to alleviate pain as required under 20 C.F.R. § 416.929(c).   (Doc. 13 at 16-18).

It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  *Rogers*, 486 F.3d at 247 (citations omitted).   In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly.  *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec'y of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so."  *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).   The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review."  *Hurst v. Sec'y of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

The ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility."  *Rogers*, 486 F.3d at 247.   Rather, such determinations must find support in the record.  *Id.*   Whenever a claimant's complaints regarding symptoms or their intensity and persistence are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record."  *Id.* "Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant while inconsistency, although not necessarily defeating, should have the opposite effect."  *Id.* at 248.

26

The ALJ's credibility determination is supported by substantial evidence.   Contrary to plaintiff's assertion otherwise (Doc. 13 at 17), the record supports the ALJ's determination that plaintiff experienced relief from knee pain after corticosteroid injections.   On May 16, 2012, plaintiff reported "decent relief" from pain after receiving a corticosteroid injection in her right knee.   (Tr. 492-93).   In September 2012, plaintiff returned for a second round of injections and reported that she "got good relief with that injection.   It has worn off over the course of the four months, but it lasted for quite some time, near the end of three months.   [She] has been happy with the results of the injections."   (Tr. 508).   Indeed, these records reflect that plaintiff opted to have both knees injected "as she gets decent relief with the injections."   (*Id.*).   Plaintiff's reports as reflected in these medical records provide substantial support for the ALJ's conclusion that plaintiff's achieved relief from her knee pain with treatment.   Moreover, the ALJ's determination to discount plaintiff's credibility is further supported given her inconsistent hearing testimony.   *See* Tr. 45-46 (plaintiff testified that the cortisone injections were not helpful and actually caused more pain); *Blacha v. Sec'y of H.H.S.*, 927 F.2d 228, 231 (6th Cir. 1990) (affirming ALJ's credibility determination where the plaintiff's testimony was inconsistent with the medical evidence).[6]

Moreover, plaintiff's contention that the ALJ failed to consider her financial situation in assessing her credibility is inaccurate.   *See* Doc. 13 at 17.   The ALJ explicitly acknowledged plaintiff's claims that she was unable to afford certain treatment and medications.   (Tr. 26).   However, the ALJ noted that plaintiff's testimony that she smokes marijuana weekly and

---

[6]Plaintiff asserts in her reply brief that the Commissioner has improperly created post hoc rationalizations for the ALJ's credibility finding by citing to the evidence showing her reports of good pain relief with the corticosteroid injections.   *See* Doc. 15 at 3, citing Doc. 14 at 13-14.   Plaintiff's argument is not well-taken as the ALJ explicitly discussed this evidence in his decision, though he did not provide a specific citation thereto.   *See* Tr.

one-half pack of cigarettes per day undercuts these claims.   (*Id.*, citing Tr. 58-59).   The ALJ was

permitted to discount plaintiff's credibility as her regular abuse of marijuana and cigarettes

undermines her claims of not being able to afford medical treatments and medications.[7]   *See*

*Moore v. Comm'r of Soc. Sec.*, 575 F. App'x 540, 542 (6th Cir. 2014) (citing *Sias v. Sec'y of*

*H.H.S.*, 861 F.2d 475, 480 (6th Cir. 1988)) (the cost of smoking is properly considered in

assessing a claimant's claims of financial inability to pay for medical treatment).

Lastly, the ALJ properly considered plaintiff's activities of daily living in assessing her

credibility.   Plaintiff claims the ALJ should have assessed her credibility consistent with the

requirements of 20 C.F.R. § 416.929(c) given her claims that pain precludes her from performing

certain activities such as household chores and personal grooming.   However, plaintiff's

testimony that she is limited in her ability to attend to her personal hygiene (Tr. 56-57) is

inconsistent with the consultative examining psychologist's observations that plaintiff was

well-groomed and appropriately dressed (Tr. 366), treatment notes from Health Resource Center

reflecting that plaintiff was well-groomed (Tr. 320), and notes from Talbert House showing that

plaintiff's appearance was appropriate and her self-care was "good."   (Tr. 536, 540).   In any

event, it was reasonable for the ALJ to discount plaintiff's claims of disabling pain given their

inconsistency with the objective evidence and clinical examination findings cited above.   *See* Tr.

260, 371-77, 378-406, 479-509.

For the above reasons, the ALJ's decision to discount plaintiff's credibility is supported

---

27.

[7]To the extent plaintiff argues the ALJ erred because "two packs of cigarettes a month does not equate to
the monetary equivalent of medical treatment for an individual with [her] impairments" (Doc. 13 at 17), plaintiff's
argument misstates the evidence of record.   Plaintiff testified that she smokes "half a pack a day."   (Tr. 59).   In any
event, the ALJ did not conclude that the cost of plaintiff's cigarettes and marijuana would cover all of her medical
costs but simply that "it was reasonable to assume she can afford some treatment or medication" given her smoking
habits.   (Tr. 28).

by substantial evidence and plaintiff's second assignment of error should be overruled.

    3. Whether the ALJ's erred at Step Five of the sequential evaluation process.

    Plaintiff's third assignment of error is a challenge to the ALJ's Step Five finding that plaintiff retains the ability to perform work as a small parts assembler, inspector, or hand packager.   Plaintiff contends this finding is not substantially supported because the ALJ presented an incomplete hypothetical question to the VE for the reasons stated in connection with her first two assignments of error.   (Doc. 13 at 18).

    Plaintiff's third assignment of error is simply a rehash of her challenge to the ALJ's RFC determination.   Accordingly, the Court incorporates its rationale stated above and finds that the ALJ did not err in his Step Five finding because his RFC finding is substantially supported and the hypothetical question posed to the VE incorporated all of plaintiff's supported limitations. Plaintiff's third assignment of error should therefore be overruled.

**III.  Conclusion**

    For the reasons stated above, **IT IS RECOMMENDED THAT** the decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date:  5/12/15

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

DEBBIE DIANE MILLER,                          Case No. 1:14-cv-562
     Plaintiff,                              Beckwith, J.
                                                      Litkovitz, M.J.

     vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).